Morning, Your Honor. Thank you for your patience. I appreciate having the opportunity to appear before you. My name is John Whitesinger, and I represent the plaintiffs and appellants in this matter who were former non-controlling partners of nine partnerships that were controlled by the defendant, AT&T Wireless, AWS, and its subsidiaries. The plaintiffs brought this action for breach of fiduciary duty and breach of partnership agreements to recover profits that were realized by the defendants when they purchased the assets of the partnerships in 2002 and 2003, and then subsequently sold the assets to Singular in 2004. Our theory of recovery is either on a contract theory of precision or a duty of accounting under a draft of a partnership law. According to the plaintiffs' expert, the profit that was realized by AWS amounted to about two and a half times the amount that was paid to my clients in 2002 and 2003. This case involves fundamental principles of partnership law, including the most basic principles that, in the absence of an agreement to the contrary, the statutory default rules apply. Counsel, can you give me a ballpark figure here? What are we talking about in total, then, if the damages are two and a half times? My clients were paid approximately $4.3 million. We're talking somewhere in the range of $12 million, $15 million. Two and a half times. Well, they've received the initial amount, so we're talking about one and a half times that amount as additional recovery. And that's based on our experts' opinion of what the value was at the time of the Singular transaction. There was a price that, I don't know what the exact amount was, $15 a share for 182 vials. But that was quite a bit later, was it not? I beg your pardon? Quite a bit later in time. The Singular transaction. It was approximately one year. The Singular transaction was negotiated and signed. It was announced in February of 2004. It was closed in October of 2004. And I think it can be regarded as a question of fact, perhaps, as to whether that was foreseeable or not. We believe that there was an industry consolidation going on. There were discussions among industry players on a regular basis. There was an expectation that AWS was going to be bought by somebody. It wasn't clear who the buyer would be. So there was no evidence in the record at the time of the acquisition of your client's interest that Singular was making an offer for? I think there was an expectation. There may have been preliminary conversations that were alluded to in the record, yes, that there were. The question is what's in the record. Yes. The question is what is in the record about – is there anything in the record that – In the deposition testimony, there were – Anything in the record before the district court on summary judgment that suggests that AT&T had any knowledge of a Singular transaction which it did not disclose? I don't think that there was a specific transaction in 2002 or 2003. We rely on the statutory duty of a partner to account for – If that's your theory, the problem I'm having in applying the Washington cases is that the Washington cases all involved facts where there was a known transaction, either a higher amount or a purchaser had been identified that was withheld from the other partners. And we don't have that situation here, as I understand your last answer. Well, we – there's evidence that the AT&T people knew that they were underpaying for the assets at the time. There's evidence that there was – That goes to the fairness of the price, right? Yes. It seems to me there's a difference. Maybe it's more a fact rather than law. But if your allegation is that there was a material nondisclosure which breached the fiduciary duty that AWS owed to your clients, then that breach could be established either by showing that your client knew that the price was not fair at the time of the transaction or that there was a suitor on the horizon that AWS anticipated consummating the deal with as soon as they bought out the interests of the minority partner. I don't think we have a duty to show that there was an expectation of a back-to-back transaction. Okay. So if – but then let me ask the follow-on question to that. Assuming that a partner has the right to pursue its own self-interest, is there anything wrong with AT&T or AWS at the time it buys out your clients thinking to itself, if we can get these people out of the way, then we will be free to go out into the market and see if we can find a suitor that will make us an attractive offer for the whole business? I think that the expectation was that by getting rid of the minority owners, they would improve the value of the asset that they were offering for sale. How does that breach the fiduciary duty? Why isn't that more of an act by a partner which is in its own self-interest and which the cases seem to recognize as not a breach of a fiduciary duty? Let me address the limitations on the acting in their own self-interest feature because I think it's critical to the case. Clearly, they can – they could have done an arm's-length transaction with anybody. They could have sold Boise to Singular. And as long as everybody was treated the same in that transaction, we would have no cause for complaint. In fact, the partnership agreements contemplated that to a degree. Assuming that Singular was then making an offer to acquire Boise, that that was not disclosed to the minority partners at the time that their interests were bought out. My thought is equality of treatment. Equality is the heart of partnership law, that people basically expect equal treatment unless otherwise provided. With your partners at the time, the problem I'm having with your theory is there's a temporal disconnect between the date on which they closed the deal with your clients and the later date where a suitor appears, makes an acceptable offer, it's agreed to, and they make two and a half times the profit that they made based on the price that they paid to your clients to buy their interests out. Well, it's an opportunistic sort of thing, that they're always, they, AT&T, are always looking for deals to be potentially bought out. It turned out that Singular was the one that- So is your theory that the minority partners' rights were violated because there was a business opportunity here that they were not made partners to? And had they not been bought out, they would have been there to share freely in the higher purchase price? No, it's not a corporate opportunity. Yeah, I mean, that would be a classic corporate opportunity theory. That's not what we're saying, that they- Let me go back to the self-interest and the equality of treatment. The Sinclair Oil against Levine case, which was cited by the district court and the A.W.A., involved the payment of a dividend. And people said, oh, well, instead of paying the dividend to the parent company, they should retain the earnings in the company, and they're acting selfishly by causing the payment of the dividend. And the Delaware court said, fine and dandy. Everybody gets the same dividend. I don't care what their motivation is for payment of the dividend. As long as everybody is treated the same, then we don't care. It doesn't implicate the duty of loyalty. Here, quite differently, we got cash, they got the assets. And so it's a dissimilarity in treatment that creates the self-dealing aspect of this. Isn't your real theory simply one that the price that was paid was simply inadequate and was unfairly undervalued based on the methodologies that Arthur Anderson and Kroll employed? I think that's part of it. I mean, at a late stage, the district court did throw out one of our experts' opinions. He was going to supplement his opinion. Okay, but we didn't have the report of, is it Mr. Walters? Chuck Walters. Yeah, who basically critiques the appraisal and the expert at AWS. Yeah, his position is that by simple arithmetic, he could have, you know, massaged his report at that. And the question I'll have to ask is whether or not that's sufficient to raise a material issue of fairness of the price. The district court said, well, that's not coherent enough. But there is evidence that the value is unfair. Did he ever express, you know, the record here is kind of sketchy, at least the one I personally have access to. The record's a little sketchy. Did he ever submit a declaration in opposition to the summary judgment? Yes. Was he expressing an opinion as to the proper valuation on the proper date? On the he expressed an opinion on the value at the time of the singular transaction. Yes, I know that. And he expressed an opinion. So my question is, did he ever submit a declaration in which he expressed an opinion about the correct appraisal value arrived at? Yes, but the district court didn't consider it. His opinion was essentially that their opinion was no good, but it didn't have a bottom line. His opinion had no bottom line. That's my question. Did he express an opinion about what a proper appraisal value would have been as is the time of the asset sale? And the district court threw it out. I'm sorry. I didn't hear you. Did you say yes or no? Yes, he did, but the district court excluded that on the ground that it wasn't timely. No, that's the accountant. That's the accountant. That's Mr. Morris or Norris. There are two. That was the accountant's report. There was another report that the district court used. I understand. My question has to do with Walters. Yeah, Walters. Walters, who had to critique the expert proffered by AWS. Right. Calculation on POP and something else. All right. My question is, did he submit a declaration, which under oath signed with an opinion, as to what, in his view, a correct appraisal value would have been as of the time of the asset sales? Yes, he did, Your Honor. And he did that, and the district court ruled that it wasn't timely and that it would be. Walters? Yes, Walters. There were three Walters reports. There was Walters I, which was his opinion on the date of the singular transactions. Walters II was his. Walters III was his opinion on the. Anything that was timely submitted. No. Did Walters express an opinion? Not according to the district court. Okay. As I understand it, we've been talking sort of over here in the case, but my understanding is that you have your arguments focused largely before that, before the question of the valuation, and deal with the assertion that the sale should never have happened to begin with. That the sale should never have happened to begin with, at any rate. Well. And then the transaction. Well, the transaction was improper because it violated the duty of loyalty provisions that are incorporated by reference into the partnership agreement. So therefore, what you're saying, I'm just trying to get the arguments straight because it's a complicated case. As I understand what you're saying, it's that the general sale of assets provision in the contract was insufficient to override the inherent, the implicit incorporated gap filler of duty of loyalty. Is that right? That's exactly right, Your Honor. The statute and case law in the district court ignored the Bassin case, B-A-S-S-A-N, against investment exchange, which is a Washington State case, Supreme Court case, specifically holding that if you're going to have a transaction that implicates the duty of loyalty, there has to be a specific enabling provision in the partnership agreement, and you can't rely on a general partner's duty. And you're arguing about why it violates the duty of loyalty is because, as you said before, they got the assets and you got the cash? Because if you got something, you didn't get nothing. Right. Yeah, there was just similar treatment. Number two, the general voting provision in the agreement doesn't apply because it has to be specific. According to partnership law and the gap-filling principle, the partnership agreement must contain a specific provision permitting the self-dealing transaction under prescribed terms. What the AWS is doing is they're supplying a term in the contract that doesn't exist. The difficulty here is that, of course, in Bassin, it was very – it was specific in the – what wasn't in the partnership agreement or in any other disclosures was the amount of profit that was to be expected on a particular transaction is very specific. Here, you do have – and I said, why don't we get your views on, because the district court's key conclusion, it seems to me, is that the agreement did not say that sales or other acts or transactions could not be with a – an affiliated party. Right. Therefore – And what I'm saying is that the statute supplies that gap. Well, the statute supplies a gap if there is a gap. Well, the statute in the case law requires – The statute here, in the district court's view, the statute – excuse me – the partnership agreements here provided either for sale of assets on a specified percentage vote of the partnership or for other acts to be taken on a specified percentage vote of the partnership. Right. And the duty of loyalty provisions in Washington, at least, say that if there is a provision for transactions to be taken on a specified percentage of the vote, then the duty of loyalty isn't implicated unless the provision is unreasonable. And there's no argument here that the provision is unreasonable. So I just wanted to focus in on that and get your response. Well, the partnership law, the gap-filling law, says that the partnership agreement may identify specific types and categories of activities that do not violate the duty of loyalty. Yes. And there is no such provision with regard to a sale of assets to a partner. That's what AWS wishes were in the end. Well, but what it says is that all partners or a number or percentage specified in the agreement may authorize, after full disclosure of all material facts, a specific act or transaction that would otherwise violate the duty of loyalty. So it assumes that you've got a violation of the duty of loyalty. Assume that. I don't think anybody's really argued that. So, I mean, everybody agrees it's implicated, probably would agree that the transaction violated it. But the point of the statute is you can trump it by a provision specifying that an act can take place by a certain percentage of vote of the partners after full disclosure. In other words, put differently, it and the Washington cases and I think almost all others turn on disclosure. So if there's a secret transaction or the details of the disclosure that impact on the duty of loyalty are not disclosed, then there's a big problem. So I want you to tell me why you think this is that kind of a problem. The problem, what's required in a partnership agreement is a provision that would say a partner can buy assets from the partnership if he gets an appraisal. Okay. So you're standing or falling on the absence of a provision in the partnership agreement without regard to the provision I just read to you. Well, the one that I ---- And so I don't know if that's true. So you're saying the provision I just read to you is irrelevant. No. I'm saying that I think we're reading the same language, perhaps, and arriving at a different conclusion. No, we're not. I'm reading the next part. You say the partnership agreement may identify specific types or categories of activities that do not violate the duty of loyalty. And I'm going to the next provision, which is an or. Oh, okay. Your Part B. And it says all of the partners or a number or percentage specified in the partnership agreement may authorize, after full disclosure, a specific act or transaction that would otherwise violate the duty of loyalty. So I'm asking you to assume with me that what happened violated the duty of loyalty. So my question is, why isn't ---- why do not the provisions that are in the agreement not ones that aren't? Why aren't the provisions that are in the agreement sufficient? Because they're general voting provisions that don't touch on the duty of loyalty. The ---- The provision I just read to you doesn't say that at all. It says the partnership agreement. Let's assume the partnership agreements say that the majority of the vote of the partners can sell the assets. The AT&T people say repeatedly there's no restriction on to whom the assets can be sold. Yes. The duty of loyalty supplies the restriction on to whom they can be sold. I understand that. I understand that perfectly. Okay. Let me ---- Absolutely. I'm asking, okay, just assume with me that the transaction violated the duty of loyalty. Okay. Let's assume that. And so what I'm focusing on is the provision of the Washington statute, which says that when the agreement specifies a number or percent of people who can authorize an act after full disclosure, it takes it out of the ---- it takes away the violation. I don't believe that's correct, Your Honor. I believe that there is no such provision. Well, would you like to read it? No. I mean, there's no such provision in the partnership agreement. And in the absence of a ---- Is what you're saying or saying that ---- No, I know the language here, Your Honor. I'm sorry. I'm not trying to be impertinent, but ---- No, no, no. I misunderstood what you were saying. I mean, I thought you ---- Yeah. There is no number or percentage specified in the partnership agreement to authorize a transaction that would ---- a sale of assets that would violate the duty of loyalty. But we're assuming that the transaction here violated the duty. Okay? That's what the statute says. Assume that it violates the duty. And it violates the duty because there's no ---- because it doesn't comply with subparagraph little one. It violates the duty because it was self-dealing and because the agreement does not allow for a transaction with an affiliated party. Okay? Correct. All right? So now I'm saying, assume all that. Why is the alternative provision not the one that matters? Well, because there is no percentage stated in the partnership agreement to authorize ---- let's say hypothetically, if a partnership agreement says a partner's transaction AT&T can buy the assets provided two-thirds of the unaffiliated partners agree, that would be the kind of provision that would satisfy the paragraph. Or it doesn't ---- well, plainly, it doesn't need to say that. There is no ---- Because what a ---- just a minute. A, C ---- The number, the percentage, the number or percentage, in our view, is unanimous because there is no ---- Excuse me. I was asking a question. I'm very sorry. Excuse me. I wish I had never gotten what it was. Oh, it was this. The second ---- are you arguing that B, the section that Judge Reimer is referring to, requires that the percentage specified be specified for an act or transaction that would otherwise violate the duty of loyalty rather than for the category of transaction? In other words, it's what you're saying that it can't simply say this is the percentage that you need to sell the assets. It needs to say this is the percentage you need to sell the assets when there is a violation of the duty of loyalty. Exactly. Right. Exactly. That's sort of arguable, but at least I understand what you're saying. That's exactly true. Can I just take one minute to address the question about the future value? There's no evidence here that the assets changed in any way. There was no change in the business plan. There was no intervening event in that one-year period between the two days. So our view is that it's a valid process. Thank you. Okay. Thank you. Next here from Brendan. Good afternoon. May it please the Court. My name is Brendan Vang, and I represent AT&T Wireless Inc. and the other AT&T wireless entities. I want to begin by turning directly to a couple of the questions that the panel asked Mr. Weisinger. First, was there any evidence in the record that at the time the transactions were completed, the first batch being in mid-2002, the second batch being in early 2003, was there any anticipation on AT&T Wireless's part of a transaction with Singular? And the answer is no. There's not a stitch of evidence in the record on that point. The second question that the panel asked was whether plaintiffs presented any evidence of fair value as of the date of the transactions. The answer to that is not so simple, but let me try to do it briefly. When the case began, the plaintiffs had this theory that there was self-dealing and that the assets were taken and used for purposes of the Singular transaction, and therefore they were entitled to recover profits from that. That theory didn't pan out for the reason I just stated. There was no evidence of any linkage between the Singular transaction later and what was known at the time of these transactions. Late in the game, after the plaintiff's expert, Mr. Walters, had already prepared an expert report assigning a value in late 2004 as of the close of the Singular transaction, he tried to reverse field. That's the late report that Mr. Weisinger alluded to. Can you help me? He referred to three Walters reports, and the one that I was reviewing was the one that's dated in January. I believe it's January 12th or 13th. Yeah. There are three reports. There was one in October of 2000. I'm losing track of the year. It was 2004, which was an exchange of reports by both sides as to the issue of fair value. He said, I'm going to assign fair value as of October of 2004. Our expert said, I'm going to assign fair value as of the date of these transactions. Several months later, they exchanged rebuttal expert reports, and that's the one where he critiques our expert, Ms. Taylor's, valuation. So that's the January 2005 report? Correct. And then shortly after that, as the trial date is approaching and after the judge had already extended the case, we get this new supplemental report from Mr. Walters saying, here's what I think the value is as of the effective date of the transactions. Mind you, this is after the close of discovery and as we're approaching summary judgment argument. Well, why shouldn't I look then at the January 2005 Walters report and I'm looking specifically at ER 953 and at 955 where there are tables showing various alternative valuations under the POP approach and under, I guess they're both POP approaches. But I see a range there, a low of $389 million, which was the Kroll AT&T number, then going up to $618 million, and then finally $938 million. Aren't those all valuations as of the date of the transaction or is this 2004? No, they're not. I understand your point, Your Honor, that there were references in that report to his assignment of value. There are several problems with that. Number one, the analysis is predicated in part on analysis that was performed by another expert in another late report that was excluded by the trial court. Mr. Morris presented a report that critiqued a few things about how the system was being managed and how the costs had been accounted for, including things like switch sharing fees and roaming fees. The court excluded that report as untimely for reasons that I could go into, but that's the predicate for Mr. Walters' analysis. Second, as Judge Peckman found in her order, there was no factual underpinnings for the summary statements made by Mr. Walters in the report you're alluding to. He simply assigned numbers but without the analytical rigor that you would expect in the underlying factual underpinnings in order to support those figures. Well, I guess for purposes of determining whether or not there is a contested issue of material fact with regard to the fairness of the price, can we not look at the January 2005 Walters report, which goes into great detail on criticizing the methodology that Kroll and I guess Ms. Taylor, on behalf of the defendants, employed in answering that question and then comes up with alternative valuations which are much higher. Isn't that enough to get past summary judgment? A couple of reasons. Number one, back to the point that Judge Peckman made, which is when she reviewed them, found that they did not have the sort of factual underpinning and analysis that you would expect of an expert. This case developed into or should have developed into what is not uncommon in Delaware Chance Report, which is an appraisal action. In an appraisal action, you wouldn't get out of the gate if you came to a summary judgment argument and you didn't have an opinion from your own expert about what you thought the value was. It was reasoned based on your own assumptions and analyses about the ---- I'm not sure why that's necessary. If the question here is whether the consideration offered was fair, why isn't it enough that it wasn't fair, whatever might have been fair, without answering the question of what was fair? Why do we have to answer the question? Why do they have to address the question of what was fair in order to show that it wasn't fair? Ultimately, their claim is that one of the claims they made in the case was for damages. Mr. Oetsinger outlined a narrower claim for relief today, but the case, one of the claims for relief is for damages. In order for them to establish what they're entitled to, there needs to be some joining of the issue on what fair value is. Second, in order to establish breach of fiduciary duty, we focus very much on the contract and what it allows. As you can tell from the briefing, the plaintiffs focus on their characterizations of partnership law and fiduciary duties. On this point, the duty to act fairly arises, as Judge Peckman found, as a function of Washington law. She cited the Carl v. Sater case, but it's also stated in the statute. Actually, the two requirements under statute are tacked loyally and with due care, but also in the statute is a statement that the partners are to equip themselves consistent with the obligation of good faith and fair dealing. It's that point that is the root of the, or one of the roots of the breach of fiduciary duty claim by plaintiffs, was it fair or not. And we put forward reasoned, supported evidence with an expert report in addition to the underlying appraisals that were done to support the asset sale prices. And there's an important point about those. AT&T Wireless didn't control this after the fact. AT&T Wireless set in motion after a long period of many years of trying to deal with the minority interest in some other consensual way, but put in place a procedure whereby the sale price for these transactions would be based on the appraisals that came back. AT&T Wireless didn't get to control the price or determine it after the fact. It said, we're going to appoint an independent appraiser. We're going to accept that value as the basis for the price. But that was a unilateral declaration, was it not, by the majority partnership, general partner, that that's how we're going to do it. And the minority partner said, well, can't we get an investment banker involved in this thing, and can't we pay for another appraiser, as is sometimes done in a classic appraisal fight, to see what a second appraiser would? And AT&T said, no. That's true. That's true. AT&T Wireless did. So now we'll face that summary judgment with Mr. Walter's report that, taken fairly in the light to the non-moving party, suggests that there are serious analytical flaws in the approach that Kroll and Ms. Taylor are taking as to the number that was arrived at and a suggestion in these two tables that the prices were, in one case, double and, in another case, three times what AWS offered. Isn't that enough to create a contested issue of material facts? Okay. Let me go back to the Walters report. In addition to the issues I cited before, that Judge Beckman didn't find it to be adequately supported, let me drill into a couple of significant flaws in his reasoning. All of the reasoning that drives those higher numbers, not all of it, but the majority of it, is linked to certain costs, switch-sharing costs and roaming charges. The switch-sharing costs, he basically assumes them away and says, let's take out switch-sharing costs so that then these partnerships will have a rate of return that would be equivalent to industry averages. Okay, you could do that, but there's no factual underpinning for doing that. Not only that, but it's inconsistent with another finding that Judge Beckman made when she considered specifically the separate breach of contract claim having to do with the switch-sharing fee. Is your argument almost in the nature of a Daubert inquiry that the district court on summary judgment can look at the proffered countervailing evidence by the plaintiff's expert and conclude that it is not worthy of belief because it wouldn't be admissible for those purposes? It would lack foundation, and therefore she would sustain an evidentiary objection to the expert offering an opinion on valuation? Judge Beckman didn't articulate it that way, but yes, I think that's a way of looking at it, and I want to just touch briefly on the second major analytical flaw in his approach, which is switch-sharing fees. There again, he just assumes away switch-sharing fees, but there's no basis in his reasoning as to why he can simply assume them away. These are partnerships that operate in specific geographic markets. There is cost of operating. When you use your cell phone, your wireless phone, and you go from place to place, you're charged, and the operator that's facilitating that call for you incurs charges, and they charge each other. There's complicated contracts that go back and forth between all these carriers. It's not a free ride, and so just assume it away and say, I'm going to take away these negative attributes of these partnerships because I want a result that says these partnerships have industry average rates of return. It's just fundamentally flawed. Well, I just want you to go either now or in a little bit to the other question that we discussed a bit later. Why don't you finish with Judge Chalmers first? Well, let me just say, but wasn't Mr. Walters essentially saying since AT&T controlled most of the entities in the major markets that were imposing all these fees, that in essence, you had to remove those because they were sort of, I don't know that he used this term, but sham charges that were being imposed? He did make that argument. The answer is a little bit complicated. Not all markets are the same. Some markets have more roaming activity than others. AT&T Wireless saw this, had to apply a methodology that would achieve some fairness across the markets, and what it ended up doing was for markets that had a lot of roaming charges, it gave them the most competitive rate that was available in the market, and we presented evidence that was unrebutted that it was rock bottom. It was lower than any other rate that was in the evidence, and for other markets where the roaming charges were reversed, it charged the most competitive rate charged by the principal competitor in that market. There's no evidence rebutting all that showing by AT&T Wireless as to how it handled these. We also pointed a case, a nicer case, a TC electrical case simply for the proposition that on summary judgments, it's not sufficient simply to point to some ability at trial to attack the credibility on an issue. You have to present evidence sufficient to rebut the showing made by the moving party, which removes the issue of fact. In other words, they have to present something sufficient to establish an issue of fact rather than pointing to their ability at trial to discredit. To go back to the basic duty of loyalty issues, back a couple steps, and the provision that we were discussing earlier about eliminating the duty. First of all, do you agree that there was a violation of the duty of loyalty? No. No. Maybe we need to do that, but for the moment, okay? For the moment. The statute allows overrides if there – if I identify specific types or categories or if all the partners or a number of percentage specifying the partnership agreement may authorize or ratify a specific after transaction. Now, my understanding is that you regard the sale of assets provision as doing that, if there is a duty of loyalty problem. Correct. Is there any case law or any reason, basis for not reading this provision as meaning you have to say in order to override the duty of loyalty that it's simply that a general provision that just deals with general transactions doesn't do it? Because of course what you're doing then is you're essentially allowing the majority to do the same thing whether there is a breach of the duty of loyalty or not with respect to the sale of assets. And the question is whether this provision isn't meant to require that it be specific, not general. Your Honor, I don't think either party has cited to the panel a specific case indicating how specific you have to be in your contract in order to invoke this section. I would point out a couple of things, though. Number one, this needs to be read together with the other provisions that we've cited, including the point that partners are entitled to act in their self-interest. Partners can transact business with a partnership that's cited in the same statutory provisions. And the case law Carl v. Sater and others that we cited to the effect that if you do transact business with a partnership, you have to do so in a way that is in good faith. To the point of all of the discussion when Mr. Oitsinger was questioning about this provision was assuming for discussion that there was a breach of loyalty. We do not assume for discussion that there was a breach of loyalty. A breach of loyalty is a situation where a partner is advancing its own interests at the expense of the partnership. And I think it was Judge Tallman that alluded to the Washington cases where there's some other deal going on that one of the partners has cooking and is going to profit from it without disclosing to the partners or doing something else underhanded. As I said at the outset, there's not a stitch of evidence on that subject in this case. The AT&T Wireless was presented with a difficult situation. It had these partnerships that were formed way back. It had fractional interests that were still lingering. But the partnerships were now being operated as part of a national business with increasingly complex technology. They had a heck of a time accounting for them, which I think there's evidence of that in the record as well. And it was costly. It was a huge drain on their resources and it was very expensive and they still weren't keeping up. The plaintiffs here say, hey, you have a duty to account. You know, this is your obligation. You're the majority partner, the general partner. And AT&T Wireless was trying mightily to do that. It had a whole team over at Kirkland dedicated to doing nothing but trying to sort out the roaming activity, the data transfer activity, where the subscribers lived, and so forth. It's a very labor-intensive, costly thing to do. When AT&T Wireless finally came to this pass, it did so only after trying every other alternative to avoid it. But of course, the reason why you're in this fix, I gather, was because the contract didn't, although I suppose it could have, provide for a way of getting rid of a partner. Right? In other words, if you had a way to simply pay off the partners to leave, you could have just done that, but it wasn't in the contract to allow you to do that. This route was provided for, which is to sell the assets to another, to an acquirer, and that's the asset. Let me say the question slightly differently because I have reason to him that it seems to me that the key legal ruling that Judge Paxson made was to construe the partnership agreements as not limiting the asset sales to non-affiliated parties. That's the first one. And the second one was to say that whether there is disclosure and fair consideration captures the heart of the duty of loyalty. You know, the first construction is certainly problematic. I'm not saying I think it's wrong, nor am I saying I think it's right. But I think it's really quite crucial. So why do you defend it? Or on what basis do you defend it? First, and restating a little bit what we said in the opening of our papers, that all of the jurisdictions, the law of which applies here under the choice of law provisions, accept the objective theory of contracts. These contracts state you may sell the assets of the partnerships. There was a provision that came into play in the reply brief by plaintiffs at the summary judgment stage, which was an amendment added to the partnership agreements in 1997 that said unanimous vote is required in certain instances. If you're changing the form of the partnership to a corporation or LLC or something else, did not address the situation where the assets are going to be sold and the partnership dissolved. Judge Peckman found, under the rule of construction, that if you provide for a certain class of things under voting provisions but not others, you're deemed to have excluded the others. That reasoning is sound. I also point, as I did a moment ago, to the other provisions in the statute that have to be read together somehow with the one you're pointing to, that you are permitted to deal with the partnership. You are able to transact business with it. It's okay to act in your self-interest. You have to be fair about it, and you can't profit yourself to the exclusion of the partnership. So how does the authority to act in your self-interest is still limited by whatever the duty of loyalty is? And you said when I first asked you that you don't think this was a violation of the duty of loyalty. Why not? Okay. As I just touched on, the duty of loyalty involves a situation where you profit at the expense of the partnership, this sort of secret deal that's cooking on the side kind of situation. This situation was, if anything, sort of the end to a detriment that the general partner had been dealing with for many years. It was not profiting from concluding these transactions. The only point that plaintiffs fall back on in order to make that argument is that, hey, we got cash and you got the assets, and that's self-dealing. That's a breach of the duty of loyalty. They wouldn't have been happy to get the cash. They just want more, right? There's that. They make that argument, too. But on this particular point, their argument as to why it was unfair and a breach of the duty of loyalty is that the AT&T wireless entities ended up with the assets, whereas they wanted to continue in the partnerships for 99 years, irrespective of how great these costs were. On that point, the essence of the issue, though, is whether the parties each received their pro rata share of fair value. Plaintiffs say, we got cash, you got assets, but they don't point to why that's a detriment. The appraisals on which these transactions were based reflect a price that's based on projections about how these partnerships would perform. It's obviously a detriment because they lost the ability to reap whatever profits there were in the future, and it turned out they were substantial. So it was a detriment in the sense that it's something they didn't want and that the partnership agreement did not in terms provide for, i.e. eliminating them from ownership of the assets and whatever growth there was in the future. So I don't say you can say that they didn't lose something. Of course they did. As it turned out, they lost a lot. Your Honor, that goes to a point about the issue of timing and what time frame you look at. No, it doesn't. Because if somebody says to me, you know, I'll give you a million dollars for your house, and I say, well, I'm sorry, I want my house. A, I like my house. B, I think the house is going to be worth a lot of money in ten years, even if it isn't now. I don't want to sell my house. And then if you force me to sell my house, you have given, you have, and then you get the appreciation. You have benefited, and I have lost, whether, whatever the valuation may have been at that time. I go back to my point. There is a question of timing here, Your Honor. And if I were to expand that analogy, I would say, but I want to stay in my house even though there's some huge costs that the way you're operating your household are imposing on the rest of the neighborhood. But let me... It also presumes that there's an entitlement in a partnership that it will last in perpetuity. It's not a corporation. A partnership lasts only as long as the partners wish to remain partners. And then if one, in this case AT&T, wants to get out, the question is, how do you extricate yourself from it in a way that's fair to the other partners? I agree with that. And this contract had a specified term, but it also said, or sooner, pursuant to the provisions of this partnership... But that's what you didn't do, as I understand it. I mean, there were termination provisions, and that's what you didn't do. The partnership was not dissolved in a way that resulted in a liquidation of all the assets. Right. You didn't dissolve the partnership, which you could have done. I'm sorry? You could have dissolved the partnership, but you didn't do that. The partnerships were dissolved. They were not dissolved. After the sale, but not before. Right. But to the point about this timing issue, it's a principle among professional appraisers, and this would be a finding at trial upon accepting expert testimony into the record, that you look at the time of the transaction issue... You're assuming that the duty of loyalty only goes as far as whatever the appraisal might be at a particular point in time, rather than to the interest in having a continuing interest in the assets that go beyond that point in time. The duty of loyalty is looked at at the time of the transaction at issue. This was a sale of assets to newly formed partnerships, and that's the time at which you look at the... If there was going to be a sale of assets. But the question is, was there going to be a sale of assets? And that's the issue. The issue is not, if there's a sale of assets, was it fair? The issue is, was there going to be a sale of assets? Correct. In a self-dealing fashion. Right. And here there was, you know, a sale of assets. A vote was taken by each partnership. The claims don't like it. They held a fractional interest and couldn't stop it. But there was a sale. The question is, at that point in time... But we're getting circular. If there was a sale, and there was a sale, if the sale violated the duty of loyalty, which you say it doesn't because it was fair, but that's the question, not the answer, then what did you have to do procedurally to do that? And you say, so then we're back to this provision, because you say all we had to do was follow the general language and the agreement on the sale of assets, and we don't have to have any special rule for a breach of the duty of loyalty sale of assets. Well, and here we have the appraisals that were the basis for the sale price. That's not the question. And I think if they were free, if they wanted to pay for it, to have their own appraisal prepared or to hire their own investment banker. That's correct. Well, what they really wanted to do was to ask AT&T to bear the lion's share of that expense after it had already paid Arthur Anderson and Kroll to perform that exercise. That's correct. All right, thank you for your... Thank you. Mr. Weitzender. Well, we've used up... Let's just equalize it a bit and give you a few minutes. In the Bassin case, which I believe should be controlling in this case, the Supreme Court of Washington said that with regard to the duty to account, the standard by the terms of the statute is not whether the general partner acted fairly and reasonably, but whether it acted as a fiduciary. So the fairness of the appraisal is almost irrelevant in terms of the Bassin case. All they focus on is, did the fiduciary make a profit on the transaction? If he did, he has to account for it. Thank you. Thank you, counsel, for your argument.
judges: Rymer, Berzon, Tallman